Mr. Sandoval, you're turned around. I don't know if our I.T. people can fix that. You can hear me. I apologize, Your Honor. Am I back on? Well, we can hear you, but we can't see you. Is your camera on? There you go. Sorry about that. I've been waiting two hours and I get on and then I hit the wrong button. I'm sorry. Understood. We're all patient with the technology. You may proceed. Thank you. All right. Good morning, Your Honors and Counsel. May it please the Court. My name is Walter Sandoval and I represent P.W., who is a minor, and his mother, Dominique Woodson. This case does involve a brachial plexus injury that resulted in Erb's palsy. The delivery of P.W. was done by a Dr. Keith Ramsey on December 7, 2013. The delivery occurred at Anonymous Hospital in Lake County, Indiana, and P.W. is now almost 7 years old with severe deficits in his left arm. This appeal is taken from an order from the District Court, Northern District of Indiana, Hammond Division, granting summary judgment, finding no question of fact as to the timeliness of the plaintiff's claims. We submit to this Court that the lower court improperly resolved inferences and conflicts in the evidence in favor of USA and against the appellants herein. We ask that the District Court's ruling be reversed as there are issues of material fact present. We have four aspects to our argument today, Your Honor, and I have seven minutes to argue this, and so I would like to start with, if the Court doesn't mind, the tolling argument. Can I start with that first? I ask you... Any way you wish, but it sounds like Judge Hamilton has a question. Yeah, the briefing in this case concentrates a great deal on the confusion and your difficulty in finding out about Dr. Ramsey's status. I understand that, but I want to make sure that I understand that if the... We're talking about a birth injury here, and if we're looking at a cruel the mother here retained you on May 30th of 2014, right? That is correct. And if the claim did not arise at birth or within the first 10 weeks of life for this child, then your claim is timely, correct? Well, 10 weeks... You're right. February, into February of 2014. That's correct, Your Honor. Okay. Because I just... Our case law on birth injuries has focused an awful lot on when people saw lawyers and has not suggested that claims accrue immediately upon birth. I agree, Your Honor. And in fact, the Blanche case, which is most similar to our case, even that case focused heavily on the mother meeting with the lawyer one to two weeks after the birth of the child. And the holding in that case was that the claims accrued sometime in September. The holding was not that the claims accrued on the date of the delivery. And so I do agree with Your Honor that the cases do not generally find that accrual begins on the date of the delivery. But isn't the test, as was set out in Arroyo, the time when a reasonable person in her position would have known enough to prompt a deeper inquiry? Yes, Your Honor. We do agree with that is the status, that is the standard. Also in the Arteaga case, they did talk about that there needs to be some knowledge that the defendant caused the injury and that the injury wasn't just from natural causes. And so I think that's an important aspect as well. In this case, unlike in Arroyo and some of the other cases, Ms. Woodson in her affidavit described the delivery as very traumatic. And she testified that her son got stuck and the doctor had to yank out with great force. And then shortly afterwards noticed that her arm, P.W.'s arm, was sagging down. Why wouldn't those facts, which are uncontested, prompt a person to do a deeper inquiry, that something was wrong here? Well, Your Honor, I guess the answer would be that sometimes deliveries are traumatic, and it doesn't necessarily mean that a doctor caused it or that there was malpractice. Remember, this is a first-time mother with no college, no medical training. A woman who lived with her mother in her mother's house, had menial jobs. But it was more than just the traumatic delivery. In particular, the fact that she noticed shortly afterwards P.W.'s arm sagging down, and she herself said she knew something was wrong then. How do you get around that? I guess, Your Honor, the fact that sometimes, I guess the answer would be, we could have a situation where a doctor delivers a baby and there's an injury. That doesn't necessarily mean there's malpractice. I mean, if every birth injury would be malpractice, I think our courts would be flooded with cases. I think the important thing here is that after he followed up with Dr. Ramsey, he followed up at subsequent visits, his arm still wasn't getting better. At that point, she said, oh gosh, this is going to be something I need to take care of. She goes and gets the records, looks into it, finds a lawyer, finds my office, and then we took the case from there. I don't think she knew right away, and she couldn't have been expected to know that the doctor committed malpractice upon her, which caused this injury. She doesn't have to know he committed malpractice. We've said repeatedly that there are bad outcomes in medicine, and that doesn't mean it's malpractice or even put you on notice. Take a look at the Nehmer's case, for example, where there was a traumatic birth, and we clearly didn't say that that was enough to put the plaintiffs on notice. Can I ask you a quick question about the Westfall Act issue, Mr. Sandoval? Yes. The government has suggested that you should have used a provision under Indiana statute to file the suit rather than going directly to the Department of Insurance first, file the suit and stay it, and then you'd have a civil action that would seem to fall within the Indiana Department of Insurance on multiple occasions that Dr. Ramsey was a qualified provider. In Indiana, when you have a qualified provider, the way that these are handled under the statute is you've got to file to the Indiana Department of Insurance first, which we did in this case. Doesn't the statute permit the filing of a suit where there's uncertainty and then stay you pursue the panel process with the Department of Insurance? Yes, Your Honor, but in this case, there wasn't any uncertainty. We were told that from the Department of Insurance that he was qualified. But yes, there is a provision that allows plaintiff's counsel to double file the case. Now, that method of doing it isn't favored by the or it hasn't been adopted by the appellate courts in Indiana. And in fact, we know about cases where attorneys have done that. Something went wrong. Somehow the provider was identified and the attorney faced sanctions because of that. And there's a filing fee involved. There's a lot more involved than just filing it, double filing it. And our Indiana appellate courts have not, they really haven't endorsed that policy of double filing the case. Thank you. Thank you, Your Honor. So, Your Honor, with respect to the tolling issue, can I speak about that for a second? Well, you are into your rebuttal time at this point, Mr. Stanton. Okay. Well, I will say that rebuttal time. Thank you. All right. Thank you. Thank you. Good morning, Your Honors, and may it please the court. The district court's decision in this case faithfully applied Blanche and Ortega. The court correctly found that plaintiff's claims accrued shortly after P.W.'s birth and did not err in refusing to toll his two-year statute of limitations. This court has twice held that members of the malpractice bar should know enough to consult the federal database on deemed facilities whenever they are approached by a client. Counsel did not do that here, and it was that error that caused the belated filing. Not any failure on Woodson's part to know that Dr. Ramsey might have injured her. I want to start by focusing on the accrual question. And the question essentially is, first, do you know that you were injured? And second, do you know that the doctor might possibly have caused it? And what my opponent has focused on is the question of, well, was it malpractice? And that's not what the question is. The question is, was the delivery itself, was that possibly what caused the problem with my child? The plaintiff knew that she was expected to have a cesarean section, and she did not have a cesarean section. The plaintiff knew that the delivery was very difficult. The plaintiff knew that it was traumatic. And the plaintiff knew that immediately after the surgery, her child's arm hung down in a way that was not normal. Those are all plaintiff's descriptions of the injury. And I think that this case is therefore similar to Blanche and similar to Ortega and similar to Goodhand. And even in the EY case, this court made a distinction between errors that might be based on prenatal injuries and delivery itself and seemed to suggest that the delivery injuries, which were in that case against a hospital at someone who could be sued in the state, started earlier than prenatal injuries. Arroyo itself is a good example. There, the cause of the injury wasn't something that was iatrogenic. It was caused by a failure to administer antibiotics. But even in that case, the district court, which was affirmed by the Court of Appeals, did not find that the statute of limitations ran on the date that the person consulted the lawyer. It ran on the date when the person had reason to suspect that the failure to administer antibiotics might have caused the injury. And in fact, the court there said it appeared that that date was actually the date of the birth of the woman's second child when antibiotics were administered. And at latest was the date when the woman watched a TV commercial that said, hey, if your child wasn't given antibiotics, you may want to talk to a lawyer. It didn't wait all the way until the day the lawyer was actually consulted. And again, to reiterate, the delay here and the reason this case was not filed on time really has nothing to do with the fact that Ms. Woodson waited a few months to consult with a lawyer. I think what my opponent has pointed out is, well, she waited to see if the injury might get better. But the court in good hand says, you don't have to understand the full extent of your injuries. It may be reasonable for somebody to say, look, I know that this was traumatic. I suspect that there was a problem here. But if it all resolves itself, I'm not going to go and sue my doctor over it, even though I think that there was... Excuse me, Mr. Howler. In birth injuries, have we ever run the accrual this fast without someone who had consulted a lawyer or gathered medical records already? Well, I don't know that this exact square issue has come up before, Your Honor. Certainly in Blanche, the court suggested that the injury occurred, that the plaintiff knew enough shortly after to know. Yeah, I mean, she talked with a lawyer within a week or two in the Blanche case, within a week or two after the birth. There's language in the opinion that certainly supports you. I'm not sure how consistent that is with, say, Kubrick or with Nemmers, our case where Judge Easterbrook's opinion for the court made clear that a traumatic birth was not enough to start the clock with a child who turned out to be badly injured. Rather, later, it was a medical report that we said might well have... One that raised the possibility of a doctor cause that first might have started the clock running. And I'm very troubled, as we've said in several opinions, that we don't want to put patients, make them so suspicious of their doctors that they have to be going to consider malpractice at the first sign of trouble. Well, I guess I understand your point, Judge Hamilton, and I would say I don't know that the court ever has had to squarely decide this question. I do believe that there is language in a number of opinions that does say in these Herb's palsy cases, which is really what many of these cases are, including Blanche and Ortega for certain, that these exact kinds of trauma, the exact kinds of things that Ms. Woodson herself described here are what trigger the knowledge. I think that- For those of us who read a lot of these cases and these unfortunate and usually avoidable injuries, we know that. The question is, does a reasonable patient know that, particularly if we've got a first-time mother? And while I have not given birth, it's- I know it's not easy ever. I understand all of that, Judge Hamilton, but I think that the AQC decision, and I think all of this court's decisions as well, suggest that the triggering event is at what point should a person reasonably investigate, and that date really should not be the date they meet with their lawyer. That isn't the date that matters. I think, look, plaintiff had come back and had said, look, here is what the medical records show. Here's the triggering event, and a lawyer is necessary to interpret that. I think that- Sorry, but you're referring to the Second Circuit's opinion in AQC? Yes, Your Honor. And there, if I recall correctly, the court said the statute began to run when a counselor advised the mother to see a lawyer, right? Yes. And we don't have anything like that here. Presumably there was something like that, something prompted, and we don't know exactly what, but prompted the mother here to go look for a lawyer and see Mr. Sandoval. Yes, Your Honor. This is the best I can do to answer your question, Your Honor. I think that what the cases say is that the general presumption is that you know of an practice principle. That's a tort principle. And essentially, the burden is on the plaintiff to show that this, no, this is the triggering event later on that caused this to accrue. And in many cases, such as Arroyo, the court has said, okay, the triggering event is the birth of the second child, or the triggering event is the need to connect up with some other person who triggers in your brain that you, that something happened here. But the triggering event is not, I now have had that event occur, and I'm now meeting with the lawyer. And the burden is on the plaintiff, and we are lacking that here. Plaintiff did not put in any medical evidence, any medical records, or make any explanation as to why some event occurred between the birth, when we know that she knew it was traumatic, when we know that she knew she didn't get the C-section she was promised, when we know that her child's arm was hanging down, and then we have a completely absent record until she shows up in the lawyer's office. And the burden is on her at the summary judgment stage to establish a triggering event. And the only triggering events she has offered are the visit to the lawyer's office, which I think is inconsistent with this court's precedence, or a date even later than that. And so for those reasons, that's all I can offer on the accrual date, Your Honor. Thank you. Thank you. What do we make of the advice she gets from Dr. Ramsey that the baby, quote, may grow into his arm? I think, Your Honor, that I don't believe that that amounts to any grounds for either equitable estoppel or equitable tolling. If it seems to me along the same lines of what I have already mentioned, that if a doctor says, it seems to me to be something, first of all, we dispute that that occurred, but I understand a summary judgment, I have to accept it. But what I would say is, it is a statement of, there is an injury, but it may not be that bad. I think that's all it is a statement of. But that then plays again into the Goodhand Principle. If you know you've been injured but don't know the full extent of the injury, that doesn't, for any reason, cause the injury not to accrue. And then the equitable tolling principles, I think, again, are squarely foreclosed by this court's decisions in Ortega and in Blanche that say the doctor is not required to explain how you sue him or her in court. And essentially the due diligence principle that this court has established, that it is the requirement of plaintiff's counsel to inquire and to determine whether or not this particular health clinic is federally qualified. And if any of that had been done here, North Shore is in the database. While employees themselves, individual doctors, are not in the database, a review of the database would reflect that. And North Shore was in the database, the investigation involved, and the complaint even alleges negligence throughout her care. And so those equitable tolling principles stick into play. I think here, I'm sorry, Judge Hamilton. With the indulgence of my colleagues for just a moment, you had proposed in your brief that in a situation like this, plaintiffs could file suit in state court and stay it under the Indiana Medical Malpractice Act. In your view, would that be sufficient to have started a civil action under the Westfall Act to gain the tolling? So, Your Honor, I do want to say the position of the United States ultimately is that under 233G, that it's not clear to the government that the Westfall Act even applies here. But if the court were to conclude that the Westfall Act did cover these kinds of actions, which I don't think it needs to reach here because that never occurred here, I mean, that would be a court filing. So that would be treated as an action. The plaintiff is entitled to file these proceedings in state court. And I realize that there are many reasons, filing fees, the potential if one makes a mistake and files something not under seal, et cetera, why one might choose not to do that. But there are also reasons to do that, such as the potential that your case is going to get thrown out on statute of limitations grounds. Thank you. All right. Thank you very much, Mr. Haller. Your time has expired. Thank you, Your Honors. In none of the cases cited in any of the briefs, was there any indication that the Indiana Department of Insurance deemed a health care provider in Indiana qualified as they did here for Dr. Ramsey? This goes to our equitable tolling argument. And I think it's clear that in this case, we, meaning myself and my client, were justified in relying on the Indiana Department of Insurance to tell us that he was a qualified provider. Normally what happens in Indiana, if there's some mistake regarding this qualification, the health care provider himself will get in touch and make the error go away. They'll provide documents about employment and that sort of thing. That's why I think the equitable estoppel agreement also is pervasive, persuasive in this case, because Dr. Ramsey didn't do any of that. The last thing, Your Honor, is that North Shore is not a defendant in this case. Plaintiffs and their counsel looked into the actions by North Shore and chose not to name that entity. All these other cases, I believe each one of them that were cited today, certainly the Blanche case, involved a clinic that was also a defendant in the case. Ours didn't have that. We had Dr. Ramsey in the hospital. That's it. Nothing told us that Dr. Ramsey was an employee of the government. I see that my time is up, Your Honor. Can I just ask quickly, are there other theories for, what's the basis for holding the hospital responsible for Dr. Ramsey's actions here? Under a parent agency, Your Honor. Yes, sorry. All right, Your Honor, the case is still pending against the hospital before the Indiana Department of Insurance. Our theory against the hospital is not only the nurse's malpractice, but also under a parent agency for Dr. Ramsey. Okay, thanks. And so that is still pending, but we do want to have the opportunity to go after Dr. Ramsey in this case. And we ask that the district court's opinion be reversed. All right, thank you for your time. And our thanks to both counsels. The case was taken under advice.